## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA
### LINCOLN DIVISION

WENJIA ZHAI, Individually,

                Plaintiff,

        vs.

SAINT FRANCIS MEDICAL CENTER, a
non-profit domestic corporation;
CENTRAL NEBRASKA ORTHOPEDICS
& SPORTS MEDICINE, P.C.  a domestic
professional corporation; PHILIP
CAHOY, M.D. an individual; SURGERY
GROUP OF GRAND ISLAND, LLC, a
domestic limited liability corporation;
STEVEN G. SCHNEIDER, M.D., an
individual; THE PHYSICIAN
NETWORK, d/b/a GRAND ISLAND
SPECIALTY CLINIC, a non-profit
domestic corporation; SUN IK LEE,
M.D., an individual; SALAM SALMAN,
M.D., an individual; RYAN C.
RAMAEKERS, M.D., an individual;

                Defendants.

CASE NO.  4:16-CV-3049

COMPLAINT

---

      This is a medical malpractice claim brought pursuant to the Nebraska Hospital-Medical Liability Act, (hereinafter NHMLA).

JURISDICTION AND VENUE

1. This is a civil action in which the Plaintiff seeks to recover damages incurred as a result of medical malpractice.

2. Jurisdiction in this Court is based upon diversity jurisdiction arising under 28 U.S.C. §1332(a), and the amount in controversy exceeds seventy-five thousand and no/100ths dollars ($75,000.00) exclusive of interest and costs.

3. Venue is proper in this District pursuant to 28 U. S. C. § 1391 because the events giving rise to Plaintiff's claims occurred within Hall County, Nebraska, all within the territorial limits of the United States District Court for the District of Nebraska.

4. This action is timely filed within two (2) years after the date when the hospital and physicians' treatment relating to the negligent treatment was completed on April 15, 2014.

PARTIES

5. Plaintiff, WENJIA ZHAI is a resident of Lincoln, Lancaster County, Nebraska and is a 28-year old male.

6. Defendant SAINT FRANCIS MEDICAL CENTER, (hereinafter, 'SAINT FRANCIS"):

   a. is a corporation licensed to operate a hospital as defined by the NHMLA;

   b. operates the Saint Francis Medical Center in Grand Island, NE;

   c. its nurses provided nursing care to the Plaintiff from March 23, 2014 through April 15, 2014; and,

   d. its nurses were acting within the scope of their authority granted by the Saint Francis Medical Center when they provided nursing care to Plaintiff.

7. Defendant CENTRAL NEBRASKA ORTHOPEDICS & SPORTS MEDICINE P.C., (hereinafter, "ORTHOPEDICS"):

   a. is a health care provider as defined by the NHMLA;

   b. is a corporation authorized by law to provide professional medical services by physicians in Nebraska;

2

    c.  does business under the name of CENTRAL NEBRASKA ORTHOPEDICS & SPORTS MEDICINE P.C.;

    d.  its physician, PHILIP CAHOY, M.D., provided medical care to the Plaintiff from March 23, 2014 through April 15, 2014; and

    e.  its physician, PHILIP CAHOY M.D., was acting within the scope of his authority with ORTHOPEDICS, when he provided medical care to Plaintiff.

8.  Defendant PHILIP CAHOY, M.D., (hereinafter, "Dr. Cahoy"):

    a.  is a health care provider as defined by the NHMLA;

    b.  is a physician licensed to practice medicine in Nebraska;

    c.  was employed by ORTHOPEDICS from March 23, 2014 through April 15, 2014; and,

    d.  was acting within the scope of his authority with ORTHOPEDICS when he provided medical care to Plaintiff from March 23, 2014 through April 15, 2014.

9.  Defendant SURGERY GROUP OF GRAND ISLAND, LLC (hereinafter, "SURGERY"):

    a.  is a health care provider as defined by the NHMLA;

    b.  is a corporation authorized by law to provide professional medical services by physicians in Nebraska;

    c.  does business under the name of CENTRAL NEBRASKA ORTHOPEDICS & SPORTS MEDICINE P.C.;

    d.  its physician, STEVEN G. SCHNEIDER, M.D., provided medical care to the Plaintiff from March 23, 2014 through April 15, 2014; and

e.  its physician, STEVEN G. SCHNEIDER, M.D., was acting within the scope of his authority with SURGERY, when he provided medical care to Plaintiff.

10. Defendant STEVEN G. SCHNEIDER M.D., (hereinafter, "DR. SCHNEIDER"):

a.  is a health care provider as defined by the NHMLA;

b.  is a physician licensed to practice medicine in Nebraska;

c.  was employed by SURGERY from March 23, 2014 through April 15, 2014; and,

d.  was acting within the scope of his authority with SURGERY when he provided medical care to Plaintiff from March 23, 2014 through April 15, 2014.

11. Defendant THE PHYSICIAN NETWORK, d/b/a GRAND ISLAND SPECIALTY CLINIC (hereinafter, "NEUROSURGERY", "PULMONARY and CRITICAL CARE", and "HEMATOLOGY"):

a.  is a health care provider as defined by the NHMLA;

b.  is a corporation authorized by law to provide professional medical services by physicians in Nebraska;

c.  does business under the name of GRAND ISLAND SPECIALTY CLINIC.;

d.  its physician, SUN IK LEE, M.D., provided medical care to the Plaintiff from March 23, 2014 through April 15, 2014;

e.  its physician, SUN IK LEE, M.D., was acting within the scope of his authority with NEUROSURGERY, when he provided medical care to Plaintiff;

4

f.  its physician, SALAM SALMAN, M.D., provided medical care to the Plaintiff from March 23, 2014 through April 15, 2014;

g.  its physician, SALAM SALMAN, M.D., was acting within the scope of his authority with PULMONOLOGY CRITICAL CARE, when he provided medical care to Plaintiff;

h.  its physician, RYAN RAMAEKERS, M.D., provided medical care to the Plaintiff from March 23, 2014 through April 15, 2014; and,

i.  its physician, RYAN RAMAEKERS, M.D., was acting within the scope of his authority with HEMATOLOGY ONCOLOGY, when he provided medical care to Plaintiff.

INTRODUCTORY ALLEGATIONS

12. Plaintiff was a 26-year old male at the time of the car roll-over accident.

13. Plaintiff had comminuted bilateral fractures of the forearm.

14. Plaintiff's fractures were treated with closed reduction on March 23 2014.

15. Plaintiff had soft tissue injury and swelling.

16. Plaintiff was treated with anticoagulation medications as prophylaxis against deep vein thrombosis.

17. Plaintiff was intubated and sedated from March 23, 2014 to April 14, 2014.

18. Plaintiff was unresponsive to painful stimulus from March 23, 2014 to April 13, 2014.

19. The risk of acute compartment syndrome was documented in the hospital records, but compartment measurements were not performed to rule out compartment syndrome.

20. That the defendant physicians, and each of them, treated the plaintiff throughout his period of hospitalization, and each of them continuously failed to recognize that the plaintiff's compartment syndrome could not be ruled out until serial compartment pressures were obtained from the upper and lower extremities.

21. That the defendant physicians, and each of them, continuously misdiagnosed the plaintiff's medical condition of compartment syndrome, and that incorrect medical treatments were continuously provided to the plaintiff throughout his period of hospitalization, and that the defendant physicians provided to the plaintiff a continuing course of incorrect treatment throughout his period of hospitalization.

22. That the defendant physicians, and each of them, continued to treat the plaintiff and that there was a continuous course of negligent treatment of the plaintiff throughout the course of the hospitalization by each of the defendant physicians.

OCCURRENCES

23. That while plaintiff was an inpatient at the Saint Francis Medical Center from March 23, 2014 through April 15, 2014 he was continuously treated through his hospitalization by his attending physician, Steven G. Schneider, M.D.; the orthopedic service and Philip Cahoy, MD; the neurosurgery service and Sun Ik Lee, MD; by the pulmonary critical care service and Salam Salman, MD.; and by the hematology oncology service and Ryan Ramaekers, MD.

24. On Sunday, March 23, 2014, shortly after 7:00 pm, a restrained Wenjia Zhai and his restrained passenger - his Mom - were involved in a motor vehicle accident in which his vehicle rolled at least five (5) times while traveling on the highway. Emergency Medical Services (EMS) arrived at the scene at 7:25 p.m., noting the need for extrication with the jaws-of-life.  Mr. Zhai was responsive to voice, had

multiple facial contusions, fixed and dilated pupils, left upper quadrant pain and rigidity, and was assessed as sustaining bilateral upper extremity fractures.

25. On March 23, 2014, abnormal radiology findings included pulmonary contusion lateral left lung, nondisplaced left clavicle fracture and comminuted left scapula fracture, and comminuted right humeral neck fracture, right parietal and sphenoid calvarium fractures with right epidural hematoma and a 3 mm leftward midline shift, small volume subdural/epidural hematoma in the anterior right middle cranial fossa, and right maxillary antrum wall fracture, and posterior dislocation of the left elbow, comminuted fracture of the left ulna, comminuted fracture of the right ulna olecranon process, and anterior and lateral dislocation of the right elbow.

26. On March 23, 2014, Sun Ik Lee, M.D., examined and evaluated Mr. Zhai in the ED. Dr. Lee described Mr. Zhai as awake without eye contact and small, nonreactive pupils; responding to pain in all extremities, no spine tenderness or step-off with palpation; and intact sensation. Head CT findings were noted. Dr. Lee noted elevated coagulation studies without a clear etiology which added to bleeding risk. However, Mr. Zhai required emergent craniotomy for his epidural hematoma.

27. On March 23, 2014, report was called to the intensive care unit (ICU) at 10:40 pm, and Mr. Zhai was admitted under the care of Drs. Schneider, Lee and Cahoy. Per History & Physical, Mr. Zhai was maintaining oxygen saturations on arrival, was groaning, would not open his eyes, and had no pupillary response. He exhibited extensive facial swelling and Drs. Schneider and Rauch did not want to intubate without knowing the extent of damage. Dr. Schneider documented that Mr. Zhai was taken to surgery in critical condition.

28. On March 23, 2014, following induction with general anesthesia and intubation, Dr. Cahoy performed closed reduction under C-arm with posterior splint application to Mr. Zhai's right elbow dislocation.  Dr. Cahoy stated the fracture was too unstable for reduction in the ED.  Mr. Zhai's proximal ulna was essentially destroyed. Dr. Cahoy held the joint in 90 degrees of flexion as best he could, applied a well-padded long-arm cast and secured it with an ace wrap.  Imaging via C-arm at the end of the procedure revealed an intact reduction.

29. On March 23, 2014, there were no orders for direct compartment measurements.

30. On March 24, 2014, Dr. Lee proceeded with craniotomy for acute right epidural hematoma evacuation. Consent was obtained emergently between two (2) physicians and with the verbal understanding of the need for intervention from Mr. Zhai's mother. Findings at surgery included right temporal subdural and epidural hematoma, the thickest point of the epidural hematoma being 1.3 cm per CT scan.  Approximately 100 ml of subgaleal hematoma was evacuated on entry. A wide craniotomy was performed and the source of the arterial bleeding - a branch of the middle meningeal artery - was coagulated with bipolar electrocautery and multiple layers of Surgicel.  No residual oozing was noted despite a preoperative elevation of coagulation studies.

31. On March 24, 2014, the consulting pulmonologist and critical care specialist, Salam Salman, MD, was consulted for acute respiratory failure and shock secondary to a motor vehicle crash that with regard to the multiple arm fractures, clavicle fracture, and scapular fracture. He wrote in his report that the surgery service will continue per orthopedic recommendations.  Dr. Salman also wrote that: "We will also monitor his pulses and see if these return once he is off pressors.

Will also trend CKs (creatine kinases) to monitor for any signs of compartment syndrome.

32. On March 24, 2014, there were no orders for direct compartment measurements.

33. On March 25, 2014, at 8:00 p.m. the nurses documented in the progress notes that they notified Dr. Salman of their inability to obtain pulses with plaintiff's feet with the Doppler in his feet.  No new orders were received by the nurses.

34. On March 25, 2014, there were no orders for direct compartment measurements.

35. On March 26, 2014, at 7:52 a.m. the surgery service documented that plaintiff remained intubated and sedated.  The treatment plan was to follow neurosurgery, orthopedics, and pulmonology.

36. On March 26, 2014, at 8:32 a.m. both lower extremities were swollen and the pulses were absent.

37. On March 26, 2014, the orthopedist, Philip Cahoy, MD, did not perform a detailed examination and the compartment pressures were not measured. He wrote in the progress note:

 No new orthopedic changes, coagulopathy, not surgical candidate.

38. On March 26, 2014, there were no orders for direct compartment measurements.

39. On March 27, 2014, the hematologist, Ryan Raemakers, MD, wrote in the progress notes that he was: "Certainly concerned about [the] increase in CK [creatine kinases] level and compartment syndrome."

40. On March 27, 2014, the neurosurgeon, Sun Ik Lee.MD, wrote in the progress notes that: "I am concerned about massive tissue injury/trauma [leading to] consumptive coagulopathy [leading to] MODS/SIRS, ARDS."

41. On March 27, 2014 the orthopedist, Philip Cahoy, MD, gave a telephone order to loosen the wraps around the Plaintiff's arms, but to keep the splints on.

42. On March 27, 2014, there were no orders for direct compartment measurements.

43. On March 28, 2014 the orthopedist, Philip Cahoy, MD, did not perform a detailed examination, and the compartment pressures were not measured. He wrote in the progress notes that there were no orthopedic changes, and that the splints were intact.

44. On March 28, 2014, there were no orders for direct compartment measurements.

45. On March 29, 2014 the nephrologist, Jay Hawkins, MD., documented in the progress notes that the chief complaints were acute kidney injury and rhabdomyolysis.

46. On March 29, 2014, there were no orders for direct compartment measurements.

47. On March 30, 2014, the nephrologist, Jay Hawkins, MD., documented in the progress notes with reference to the rhabdomyolysis that the CK [creatine kinases] were trending down, and that there was no evidence of compartment syndrome.

48. On March 30, 2014, there were no orders for direct compartment measurements.

49. On March 31, 2014, surgery documented in the progress note that that there was not much to do from the surgeon's point of view and noted a thank you to pulmonology and nephrology.

50. On March 31, 2014, the consulting infectious disease physician, Daniel M. Brailita, MD, noted in his consultation report requested for fever and status post motor vehicle accident and wrote that his impression was: "Significant swelling and blistering of the right arm. Question if this is posttraumatic. Differential diagnosis includes trauma, new deep venous thrombosis and even septic thrombophlebitis

of the right upper extremity. It does not look like a compartment syndrome at this point. It may be due to worsening anasarca also."

51. On March 31, 2014, the infectious disease physician documents in the progress notes his recommendation that the plaintiff be monitored for compartment syndrome in the right arm.

52. On March 31, 2014, the orthopedist, Philip Cahoy, MD makes a progress note that the splints are in place. A detailed examination was not done.

53. On March 31, 2014, there were no orders for direct compartment measurements.

54. On April 1, 2014, the nephrologist, Jay Hawkins, M.D., documented in the progress notes that there was no evidence of compartment syndrome in the plaintiff who was volume overloaded.

55. On April 1, 2014, the critical care pulmonologist, Hadi Hatoum, M.D., assessed the plaintiff, but did not include compartment syndrome in the assessment and plan.

56. On April 1, 2014, the urologist, Gregory Alberts, MD documented significant penile scrotal edema with evidence of skin breakdown.

57. On April 1, 2014, the orthopedist, Philip Cahoy, MD examined plaintiff and documented that the left elbow was reduced and placed in padded long arm splint, and the right elbow was placed in splints.

58. On April 1, 2014, there were no orders for direct compartment measurements.

59. On April 2, 2014, the assessment included volume overload, but did not include compartment syndrome.

60. On April 2, 2014, the assessment by the nephrologist, Jay Hawkins, M.D., was that the rhabdomyolysis was improving and that the aquaphoresis for the edema was held off.

61. On April 2, 2014, the assessment by the neurosurgeon, Sun Ik Lee, MD, was to schedule a brain MRI.

62. On April 2, 2014, the assessment by surgery was that there was not much for surgery to do and that the consults by other specialists were appreciated.

63. On April 2, 2014, the assessment by the pulmonologist critical care documented that the plaintiff remained intubated and sedated, and treatment plan was that the fluid overload was improving.

64. On April 2, 2014, infectious disease documented that the fevers resolved.

65. On April 2, 2014, the orthopedist, Philip Cahoy, MD documented in the progress notes that the trauma physicians at Bryan LGH will see plaintiff when he is stable enough for travel.

66. On April 2, 2014, there were no orders for direct compartment measurements.

67. On April 3, 2014, the assessment by nephrology was that the chief complaints were that the acute kidney injury resolved, and with the rhabdomyolysis the CK was trending down, and the edema was improving.

68. On April 3, 2014, the assessment by pulmonology was that the acute respiratory failure was improving.

69. On April 3, 2014, the orthopedist ordered the bilateral upper extremity splints to be maintained, and documented in the progress notes that No new ortho changes. To Lincoln when stable enough.

70. On April 3, 2014, APRN Gallagher from pulmonology critical care orders venous Doppler bilateral lower extremities only.

71. On April 3, 2014, infectious disease documented that the sedation was off and the plaintiff was waking up.

72. On April 3, 2014, there were no orders for direct compartment measurements.

73. On April 4, 2014, nephrology assessed the rhabdomyolysis as improving.

74. On April 4, 2014, pulmonology assessed the acute respiratory failure.

75.  On April 4, 2014, infectious disease assessed the fever.

76. On April 4, 2014, neurosurgery assessed and documented no movement on extremities even on noxious stimulus, and open eyes to painful stimulus

77. On April 4, 2014, orthopedics documented the splints were intact and the transfer to Lincoln when stable.

78. On April 4, 2014, there were no orders for direct compartment measurements.

79. On April 5, 2014, nephrology documented that the acute kidney injury resolved and that the rhabdomyolysis continued to improve.

80.  On April 5, 2014, pulmonology and critical care documented that the tracheotomy was performed.

81.  On April 5, 2014, orthopedics documented that the dressing on the right arm was changed, noted multiple abrasions, and no infection.

82. On April 5, 2014, physical therapy applied passive range of motion to both lower extremities and documented no noted muscle tightness.

83. On April 5, 2014, neurosurgery documented that no movement to extremities, and the treatment plan included EMG/NCS when limb swelling reduced.

84. On April 5, 2014, there were no orders for direct compartment measurements.

85. On April 6, 2014, neurosurgery documented that there was no movement on the extremities upon noxious stimulus.

86. On April 6, 2014, nephrology documented the rhabdomyolysis CR continued to slowly trend down.

87. On April 6, 2014, pulmonology documented that plaintiff was overall stable.

88. On April 6, 2014, orthopedics documented that plaintiff was afebrile and his hemoglobin was 8.9.

89. On April 6, 2014, there were no orders for direct compartment measurements.

90. On April 7, 2014, nephrology documented that plaintiff was unresponsive, and that his CK continued to trend down.

91. On April 7, 2014, pulmonology documented that plaintiff was awake, but unable to follow commands.

92. On April 7, 2014, neurosurgery documented that plaintiff had delayed response to his father's commands to open and close eyes, and there was no response to noxious stimuli and negative Babinski's sign.

93. On April 7, 2014, surgery documented that plaintiff could open his eyes, but her was not real responsive.

94. On April 7, 2014, orthopedics documented that the splints were intact, and that the dressings were changed over the weekend, and that both arms will be x-rayed later in the week.

95. On April 7, 2014, there were no orders for direct compartment measurements.

96. On April 8, 2014, nephrology documented that plaintiff was alert, but not responsive.

97. On April 8, 2014, neurosurgery documented that plaintiff was awake and opened his eyes spontaneously, and did not move any extremity other than his left leg. The plan was to start the transfer planning for bilateral arm repair.

98. On April 8, 2014, surgery documented that plaintiff was starting to follow commands and plaintiff was getting close to be able to transfer, and that this will be discussed with Dr. Cahoy.

99. On April 8, 2014, pulmonology documented that plaintiff was moving his leg and closing his eyes to command.

100.     On April 8, 2014, social work spoke with Dr. Cahoy about transferring plaintiff to Bryan LGH for bilateral arm repair, and Dr. Cahoy will get the transfer started.

101.     On April 8, 2014, orthopedics documented that the right arm splint was in place, and the Dr. Cahoy will speak with Dr. Scamari about plaintiff's transfer.

102.     On April 8, 2014, there were no orders for direct compartment measurements.

103.     On April 9, 2012, pulmonology documented that plaintiff was agitated the previous night.

104.     On April 9, 2012, neurosurgery documented that plaintiff was sedately lightly and did not open his eyes, but was able to move his left leg to command.

105.     On April 9, 2012, nephrology documented that plaintiff's edema was improving.

106.     On April 9, 2012, neurosurgery assessed plaintiff with critical care illness myopathy and that his diaphragm muscles are expected to be weak.

107.      On April 9, 2012, surgery documented that plaintiff was getting close to transfer.

108.    On April 9, 2012, orthopedics documented an evaluation of plaintiff, and confirmed that Dr. Dave Samani will see the plaintiff at the Madonna Rehabilitation Hospital.

109.    On April 9, 2014, there were no orders for direct compartment measurements.

110.    On April 10, 2014, nephrology documented the chief complaint was rhabdomyolysis.

111.    On April 10, 2014, surgery documented that plaintiff occasionally follows commands and moving lower extremity.

112.    On April 10, 2014, pulmonology documented that plaintiff was generally awake and following commands.

113.    On April 10, 2014, neurosurgery documented spontaneous right lower extremity movement and the plaintiff was breathing spontaneously. There was a slight withdrawal to noxious stimulus. The assessment was that the multiple orthopedic injury and tissue damage was highly suspicious for critical care illness myopathy and polyneuropathy.

114.    On April 10, 2014, infectious disease documented that plaintiff had his eyes open.

115.    On April 10, 2014, there were no orders for direct compartment measurements.

116.    On April 11, 2014, neurosurgery documented that plaintiff's eyes were open, but there was no response to noxious stimulus.

117.    On April 11, 2014, nephrology documented that the chief complaint was rhabdomyolysis.

16

118.     On April 11, 2014, pulmonology documented that plaintiff opens his eyes and still gets tachypnea on the tracheostomy collar.

119.     On April 11, 2014, surgery documented that plaintiff seemed to be tracking a little more and followed some commands. The assessment was that plaintiff was slowly improving enough to transfer.

120.      On April 11, 2014, there were no orders for direct compartment measurements.

121.      On April 12, 2014, nephrology documented that plaintiff opened his eyes and moved his legs.

122.      On April 12, 2014, orthopedics documented that the right splint was changed and that the left splint was changed a couple of days ago, and the x-rays were reviewed.

123.     On April 12, 2014, neurosurgery documented that plaintiff was intubated and followed commands inconsistently and that plaintiff was neurologically stable.

124.     On April 12, 2014, there were no orders for direct compartment measurements.

125.     On April 13, 2014, nephrology documented that the rhabdomyolysis was improved.

126.     On April 13, 2014, pulmonology documented that plaintiff remained vent dependent and the review of systems was unobtainable.

127.     On April 13, 2014, orthopedics documented that the transfer to Lincoln was next week.

128.    On April 13, 2014, physical therapy documented during the passive range of motion therapy session that the plaintiff did open his eyes several times, and did not respond otherwise.

129.    On April 13, 2014, there were no orders for direct compartment measurements.

130.    On April 14, 2014, nephrology documented that the inputs and outputs were matched, and that plaintiff opened his eyes.

131.    On April 14, 2014, surgery documented that plaintiff remained on the tracheostomy mask and that plaintiff was in a holding pattern as Madonna Rehabilitation Hospital hesitant to accept plaintiff as a patient secondary to the fractures of the arms.

132.    On April 14, 2014, pulmonology critical care documented that plaintiff was stable and afebrile.

133.    On April 14, 2014, neurosurgery documented that plaintiff withdrew to pain on his right lower extremity and no further neurosurgery evaluations planned pending plaintiff's transfer to for additional care for his right elbow.

134.    On April 14, 2014, physical therapy documented that during treatment plaintiff did not provide assistance.

135.    On April 14, 2014, there were no orders for direct compartment measurements.

136.    On April 15, 2014, nephrology documented that plaintiff's eyes were open, but not tracking, and no edema was noted.

137.    On April 15, 2014, pulmonology critical care noted that plaintiff's eyes were open but not interactive.

138.    On April 15, 2014, neurosurgery documented that plaintiff opened his eyes and moved his left lower extremity.

139.    On April 15, 2014, surgery documented that plaintiff was to be evaluated in Lincoln for an orthopedic evaluation.

140.    On April 15, 2014 physical therapy documented that plaintiff opened his eyes, but was not tracking much.

141.    On April 15, 2014, there were no orders for direct compartment measurements.

PROFESSIONAL NEGLIGENCE  GENERALLY

142.    The corporate defendants and their agents and employees were jointly and severally negligent when the health care providers failed timely recognize and treat plaintiff's compartment syndrome.

PROFESSIONAL NEGLIGENCE OF THE PHYSICIANS

143.    That as a result of the physician-patient relationship between the plaintiff and the defendant physicians, the defendant physicians owed a duty to the plaintiff to possess and use the care, skill, and knowledge ordinarily possessed and used under like circumstances by other members of their profession engaged in a similar practice in the same or similar localities.

144.    The defendant physicians, and each of them, breached their duty to the plaintiff to possess and use the care, skill, and knowledge ordinarily possessed and used under like circumstances by other members of their profession engaged in a similar practice in the same or similar localities in that they:

    A.  Failed to include compartment syndrome in the differential diagnosis;

B.   Inappropriately ruled out compartment syndrome without measuring the compartment pressures in plaintiff while he was intubated and unconscious;

C.   Failed to recognize that acute compartment syndrome most often develops after significant trauma;

D.   Failed to recognize that acute compartment syndrome is seen more often in patients under 35 years of age;

E.   Failed to recognize that young men have the highest incidence of acute compartment syndrome;

F.   Failed to recognize that the risk of acute compartment syndrome increases with comminuted fractures of the bones of the forearm;

G.   Failed to recognize that closed fracture reduction decreases the volume and alters the configuration of the tissue compartments which increases the compartment pressures;

H.   Failed to recognize that unconscious or obtunded patients with prolonged limb compression are at greater risk of developing acute compartment syndrome secondary to soft tissue injury and swelling;

I.   Failed to recognize that plaintiff was a critically ill trauma patient who was at a particularly high risk for acute compartment syndrome and that serial compartment measurements should have been obtained;

J.   Failed to recognize that the most important aspect of diagnosis was to maintain a high index of suspicion as plaintiff was at risk for acute compartment syndrome;

K.  Failed to recognize that plaintiff's risk for acute compartment syndrome was moderate to high, and frequent serial measurements of compartment pressures was needed for plaintiff;

L.  Failed to recognize that the while plaintiff was critically ill, sedated, and intubated that regular compartment pressure measurements were needed;

M.  Failed to recognize that measuring compartment pressures in patients at risk for acute compartment syndrome, such as plaintiff, does not involve any major complications, and that failing to obtain compartment pressures measurements increases needlessly the risk of a missed diagnosis and permanent injury;

N.  Failed to recognize that anticoagulation, such as prophylaxis against deep vein thrombosis may contribute to acute compartment syndrome;

O.  Failed to recognize that the plaintiff by March 25, 2014 developed rhabdomyolysis and this medical condition increased the risk for acute compartment syndrome;

P.  Failed to recognize that the plaintiff was at significant risk for acute compartment syndrome;

Q.  Failed to perform compartment pressure measurements to confirm the suspicion of acute compartment syndrome;

R.  Failed to recognize that trending creatine kinases laboratory values to monitor for any signs of compartment syndrome should not be used for diagnosis;

S.  Failure to recognize that arterial pulses and normal capillary refill can persist despite the presence of prolonged and severe compartment pressures;

T.  Failed to recognize the limited accuracy of the physical examination for identifying acute compartment syndrome;

U.  Failing to recognize that compartment pressures should be measured whenever any clinician suspects acute compartment syndrome based upon plaintiff's risk factors and clinical signs; and

V.  Failed to recognize that non-invasive intra-compartment pressure monitoring should have been performed within all compartments and at multiple sites within 5 cm distal and proximal to the injury.

## PROFESSIONAL NEGLIGENCE OF THE NURSES

145.  That as a result of the physician-patient relationship between the plaintiff and the defendant nurses, the defendant hospital's nurses owed a duty to the plaintiff to possess and use the care, skill, and knowledge ordinarily possessed and used under like circumstances by other members of their profession engaged in a similar practice in the same or similar localities.

146.  The nurses employed by the hospital breached their duty to the plaintiff to possess and use the care, skill, and knowledge ordinarily possessed and used under like circumstances by other members of their profession engaged in a similar practice in the same or similar localities in that they:

A.  Failed to advocate for the plaintiff;

B.  Failed to recognize that acute compartment syndrome most often develops after significant trauma;

C.  Failed to recognize that acute compartment syndrome is seen more often in patients under 35 years of age;

D.  Failed to recognize that young men have the highest incidence of acute compartment syndrome;

E.  Failed to recognize that the risk of acute compartment syndrome increases with comminuted fractures of the bones of the forearm;

F.  Failed to recognize that closed fracture reduction decreases the volume and alters the configuration of the tissue compartments which increases the compartment pressures;

G.  Failed to recognize that unconscious or obtunded patients with prolonged limb compression are at greater risk of developing acute compartment syndrome secondary to soft tissue injury and swelling;

H.  Failed to recognize that plaintiff was a critically ill trauma patient who was at a particularly high risk for acute compartment syndrome and that serial compartment measurements should have been obtained;

I.  Failed to recognize that the most important aspect of diagnosis was to maintain a high index of suspicion as plaintiff was at risk for acute compartment syndrome;

J.  Failed to recognize that plaintiff's risk for acute compartment syndrome was moderate to high, and frequent serial measurements of compartment pressures was needed for plaintiff;

K.  Failed to recognize that the while plaintiff was critically ill, sedated, and intubated that regular compartment pressure measurements were needed;

L.  Failed to recognize that measuring compartment pressures in patients at risk for acute compartment syndrome, such as plaintiff, does not involve any major complications, and that failing to obtain compartment pressures measurements increases needlessly the risk of a missed diagnosis and permanent injury;

M.  Failed to recognize that anticoagulation, such as prophylaxis against deep vein thrombosis may contribute to acute compartment syndrome;

N.  Failed to recognize that the plaintiff by March 25, 2014 developed rhabdomyolysis and this medical condition increased the risk for acute compartment syndrome;

O.  Failed to recognize that the plaintiff was at significant risk for acute compartment syndrome;

P.  Failed to perform compartment pressure measurements to confirm the suspicion of acute compartment syndrome;

Q.  Failed to recognize that trending creatine kinases laboratory values to monitor for any signs of compartment syndrome should not be used for diagnosis;

R.  Failure to recognize that arterial pulses and normal capillary refill can persist despite the presence of prolonged and severe compartment pressures;

S.  Failed to recognize the limited accuracy of the physical examination for identifying acute compartment syndrome;

T.  Failing to recognize that compartment pressures should be measured whenever any clinician suspects acute compartment syndrome based upon plaintiff's risk factors and clinical signs;

U.  Failed to recognize that non-invasive intra-compartment pressure monitoring should have been performed within all compartments and at multiple sites within 5 cm distal and proximal to the injury;

V.  Failed to recognize the risk of compartment syndrome when his pulses were absent; and

W.  Failed to recognize the risk of compartment syndrome and advocate for the plaintiff that pulses were absent.

ORDINARY AND REASONABLE CARE

143.  All corporations holding licenses to provide medical services by physicians, certified registered nurse anesthetists, and nurses in Nebraska are required to provide ordinary and reasonable care for the benefit of their patients in Nebraska.

144.  Under Nebraska law, malpractice or professional negligence means that, in rendering professional services, a health care provider has failed to use the ordinary and reasonable care, skill, and knowledge ordinarily possessed and used under like circumstances by members of their profession engaged in a similar practice in their or in similar localities.

145.  In determining what constitutes reasonable and ordinary care, skill, and diligence on the part of a health care provider in a particular community, the test, as defined in Nebraska law, shall be that which health care providers, in the same community or in similar communities and engaged in the same or similar lines of work, would

ordinarily exercise and devote to the benefit of their patients under like circumstances.

146.   Failure to use ordinary and reasonable care, skill, and diligence is professional negligence or malpractice.

147.   In this case, the duty to provide ordinary and reasonable care during the treatment of the plaintiff required that physicians who treat traumatically injured patients in the hospital would recognize and identify the risk of the occurrence of compartment syndrome and take the needed reasonable steps to manage that risk to protect their patient from additional injury.

148.   In this case, the duty to provide ordinary and reasonable care during the treatment of the plaintiff required that nurses who care for traumatically injured patients in the hospital would recognize and identify the risk of the occurrence of compartment syndrome and advocate to the physicians that reasonable steps are needed to manage that risk to protect their patient from additional injury.

CAUSATION

149.   That as a direct and proximate result of the joint and several negligence of Defendants, and each of them as set forth above, Plaintiff suffered permanent physical injuries to his upper and lower extremities when his compartment syndrome was not timely recognized and treated during his period of hospitalization.

WAIVER OF PANEL REVIEW AND UNCONSTITUTIONALITY OF THE NEBRASKA HOSPITAL MEDICAL LIABILITY ACT

26

150.    Plaintiff alleges that the that the Defendants do not qualify for coverage under the Nebraska Hospital Medical Liability Act, and have failed to comply with the requirements of the Act.

151.    Plaintiff alleges that even though the Defendants may have filed with Nebraska Department of Insurance claims for special benefits, privileges, and other protections under the act, Plaintiff alleges the NMHLA is unconstitutional in whole or in part because it violates the Seventh and Fourteenth Amendments to the Constitution of the United States, as well as the following provisions of the Constitution of the State of Nebraska: Article 1 §§ 1, 3, 6, 13, 16, 21, 25, and 26; Article II, § 1; Article III, §18; Article V, §2; Article VI, §1, and Article XII, §10(c).

152.    Plaintiff alleges that through the act of filing his Complaint affirmatively waives his right for a medical review panel to review his claims against the defendants as provided by the NHMLA and elects to file this action directly in the District Court of Hall County, Nebraska.

153.    Plaintiff alleges that copies of this Complaint were mailed to the Director of the Department of Insurance and to the Attorney General of the State of Nebraska.

WHEREFORE, pursuant to the NHMLA, Plaintiff asks for damages as are reasonable in the premises, that Neb. Rev. Stat. § 44-2825 be declared unconstitutional, and for his taxable costs.


Dated this 1st day of April, 2016.

WENJIA ZHAI, an individual,
Plaintiff,

By:      /s/ Steven M. Watson

John F. Carroll, #23811
Steven M. Watson, #16075
WATSON & CARROLL, PC, LLO
160 Centre Place
2809 South 160th Street, Suite 409
Omaha NE  68130-1755
Office: 402.991.2100
Fax:    402.991.2110
john@watsoncarroll.com
steve@watsoncarroll.com
ATTORNEYS FOR THE PLAINTIFF