IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| WENJIA ZHAI, Individually; <br><br> Plaintiff, <br><br> vs. <br><br> CENTRAL NEBRASKA ORTHOPEDICS & SPORTS MEDICINE, P.C., a domestic professional corporation; et al; <br><br> Defendants. | 4:16CV3049 <br><br> 1) PLAINTIFF'S AMENDED REQUESTFOR PORTIONS OF PHILIP CAHOY, M.D'. 'S DEPOSITION TO BE READ AT TRIAL; AND <br><br> 2) DEFENDANTS' REQUEST FOR RULING ON DEPOSITION OBJECTIONS AND FOR ADDITIONAL PORTIONSTO BE READ AT TRIAL |

See attached rulings on the proposed deposition testimony of Defendant Philip Cahoy, M.D. to be offered in Plaintiff's case-in-chief.

Dated this 27th day of March, 2018.

BY THE COURT:

*s/ Cheryl R. Zwart*
United States Magistrate Judge

**1.)  Plaintiff's Requested Portions:**

42:23 Q. (By Mr. Watson) And why is it your habit to read the

24 consultation notes of the critical care physician?

25 A. To see if there would be anything pertaining to

43:1 what I do.

44:10 Q. (By Mr. Watson) Okay. And so when you would see the patient on

11 a daily basis, is it fair to believe that you would also

12 look at the chart on a daily basis?

13 A. Typically.

72:16 Q. (By Mr. Watson) But that was something that you

17 chose to do on a daily basis in your examinations of

18 Wenjia Zhai?

19 ~~MR. ERNST: Object to form.~~   Overruled

20 Q. (By Mr. Watson) To examine him for compartment

21 syndrome, true?

22 A. No. I was not examining him for specifically

23 compartment syndrome. We were -- I was examining him for

24 any other secondary -- it's called secondary surveys where

25 you check everything for several days to make sure -- two,

73 three, four days later sometimes fractures show up with

2 swelling, ecchymosis. So again, it's just a secondary

3 survey.

**Defendants' Request for Rulings on Objections/Additional Portions:**

Defendants request a ruling sustaining the above objection (72:20) because the question is vague and ambiguous. Without this question, the rest of the excerpt does not make sense and should be stricken. If not, Defendants request the additional portion noted below, pursuant to *FRCP* 32(a)(6), which provides that "If a party offers in evidence only part of a deposition, an adverse party may    Granted

1

require the offeror to introduce other parts that in fairness should be considered with the part introduced, and any party may itself introduce any other parts":

```
 4    Q.  So is it fair to believe that you were
 5  performing the secondary survey for up to four days after
 6  Wenjia Zhai arrived in the hospital under your care
 7  looking for other medical problems?
 8    A.  At least.
 9    Q.  And would compartment syndrome be one of those
10  other medical problems that could arise within the two to
11  three to four days in the hospital after a traumatic
12  fracture?
13    A.  Anything is possible, but again, it wasn't the
14  situation in this case.
```

(73:4-14)

**2.)  Plaintiff's Requested Portion:**

88:12 Q. (By Mr. Watson) Okay. Did you expect the other

13 physicians to consider you to be the primary physician

14 examining for compartment syndrome?

15 ~~MR. ERNST: Object. Form and foundation. Asked~~    Overruled

~~16 and answered~~.

17 A. Not consciously.

18 Q. (By Mr. Watson) What do you mean "not

19 consciously"?

20 A. I don't think they consciously said, We're going

21 to have Dr. Cahoy look at compartment syndrome. I think

22 they would look at the patient. If they saw something,

23 they would have a discussion with me.

**Defendants' Request for Ruling:**

Defendants request a ruling regarding the above objection (88:15) because it is vague and ambiguous as to "primary physician" and was asked and answered.

2

**3.)    Plaintiff's Requested Portion:**

~~87:20 Q. Okay. So you retained the challenge of~~

~~21 examining him for compartment syndrome?~~

~~22 A. Correct.~~

**Defendants' Request for Ruling/Additional Portions:**

Defendants note that Plaintiff did not include the defense objection (87:23) which should be sustained because "retained the challenge" is vague and ambiguous.  If not sustained, Defendants request the additional portion be read into evidence:

> Sustained

~~24    A.    As far as —~~
~~25    Q.    (By Mr. Watson)   The care of —~~

~~87~~

~~1    A.    I didn't specifically say, Nobody touch him.~~
~~2 No, I didn't say, Nobody can touch him but me.~~
~~3    Q.    But it was understood that you were the~~
~~4 physician who was looking for compartment syndrome?~~
~~5    A.    No. That's not understood that I'm the only one~~
~~6 looking for that.~~

(87:24-88:6)


**4.)    Plaintiff's Requested Portion:**

94:5 Q. Was there a reason why you decided not to

6 document your medical opinion that Mr. Zhai did not have

7 compartment syndrome?

8 A. Again, it was low on the list. He just did not

9 have the clinical indication to have compartment syndrome.

10 There is a lot of negatives that I could fill a chart

11 with.


**5.)    Plaintiff's Requested Portion:**

122:13 Q. Okay. Is there a different standard of care

14 when a patient is intubated and unconscious and unable to

3

15 respond to the examiner's questions?

16 A. If that was the only confounding factor, no, I

17 don't believe so. I think, again, clinical judgment is

18 going to be the standard of care for that patient, also.

46:9 Q. Was compartment syndrome relevant to your part

10 of the care of Wenjia Zhai?

11 A. It was considered but very low.

12 Q. What do you mean "it was considered" but it was

13 "very low"?

14 A. His examination and his clinical situation did

15 not project any suspicion of compartment syndrome.

**6.)    Plaintiff's Requested Portion:**

50:19 Q. And was your scope of practice the fractures

20 sustained by Wenjia Zhai?

21 A. Correct.

22 Q. And would it be fair to say that your scope of

23 practice also included the risk of compartment syndrome?

24 A. Generalized scope of practice or are you talking

25 about --

51:1 Q. In the care of Wenjia.

2 A. Delegated to me or just everybody? It wasn't

3 delegated. It was I understand the compartment syndrome

4 and its relationship to musculoskeletal injury if that's

5 what you're saying.

**Defendants' Request for Additional Portions:**

Defendants request the following additional portions be read into evidence: granted

```
10    Q.  Were you of the belief that you needed to be
11 ordered to look for compartment syndrome before you would
12 start to look?
13    A.  No.
14    Q.  And why were you not required to be ordered to
15 look for compartment syndrome?
16    A.  As a physician treating a patient in his
17 position, everything overlaps, again, so everybody has
18 that responsibility to keep an eye almost on everything.
19 Now, some people may have more of an expertise or more of
20 a training than other people, but to have the
21 responsibility alone, I would say no.
```

(52:10-21)


**7.)    Plaintiff's Requested Portion:**

57:5 Q. Did you -- did you tell Dr. Salman that his idea

6 to trend CKs to monitor compartment syndrome was a medical

7 error?

8 A. No. I don't believe I confronted him. There

9 were many of the doctors, again, when you talk to them

10 face-to-face that say, He doesn't have compartment

11 syndrome.

12 Q. Did you talk to anyone face-to-face and say that

13 Wenjia Zhai does not have compartment syndrome?

14 A. Multiple doctors. Again, three and a half years

15 ago, I can't remember their face. I remember

16 conversations with them.


**8.)    Plaintiff's Requested Portion:**

57:19 Q. Do you remember which physicians you had these

20 conversations where you said, Wenjia Zhai does not

21 compartment syndrome?

22 A. I believe Dr. Schneider and Dr. Salman and,

23 again, down the line, Dr. Hawkins.

**Defendants' Request for Additional Portions:**

Defendants request the following additional portions be read into evidence:  Granted

```
24      Q.  Okay.  Is it fair to say that you were the
25  person that was making the determination that Wenjia Zhai
                                                         57
 1  does not have compartment syndrome and that you told that
 2  to many of the physicians caring for Wenjia Zhai?
 3      A.  No.  It was a discussion, and all of them
 4  believed -- again, the discussion was we did not feel he
 5  has compartment syndrome.
```

(57:24-58:5)


**9.)    Plaintiff's Requested Portions:**

58:11 Q. Okay. So you had multiple conversations in the

12 ICU with several of the physicians, and you would make the

13 statement, Wenjia Zhai does not have compartment syndrome,

14 true?

15 A. I don't know if I would make that statement that

16 way. I believed that I would say, I don't feel Mr. Zhai

17 has compartment syndrome, and somebody would say, I don't

18 feel also. It was not an argumentative process going on

19 there, so it was a group discussion, again, feeling that

20 that was a very low possibility, very low.

21 Q. Did you have that discussion with the doctors

22 more than three times?

23 A. Again, it would be hard -- Several times.

**10.)  Plaintiff's Requested Portions:**

59:2 Q. There would be a group of physicians talking

3 about Wenjia Zhai, the subject of compartment syndrome

4 would come up, and then you would make the decision or the

5 statement, I believe he does not have compartment

6 syndrome; is that true?

7 A. Several -- direct meetings, we may have talked

8 to one guy -- one doctor -- one side of the table and then

9 another one is doing something on the other side of the

10 table and, again, discussed that. Again, not in length

11 because it was essentially deemed, again, not a priority

12 list because it wasn't much of a consideration for him.

**Defendants' Request for Additional Portions:**

Defendants request the following additional portion be read into evidence: → Granted

```
13     Q.  And the reason it -- what was the reason why
14  compartment syndrome was not much of a consideration for
15  Wenjia Zhai?
16     A.  He didn't fit the clinical indications for it.
17     Q.  And what were the clinical indications you were
18  looking for?
19     A.  Again, looking for deformities of the legs,
20  tight compartments to palpation, again, any trauma or any
21  tight, hard compartments in his legs.  He just did not
22  have those.
```

(59:13-22)


**11.)  Plaintiff's Requested Portions:**

61:2 Q. Did you document anywhere in the chart the

3 clinical findings that would lead you to believe that he

4 did not have compartment syndrome?

5 A. Those are all negatives, so I wouldn't document

6 negatives.

**12.) Plaintiff's Requested Portions:**

61:7 Q. Okay. And did you document in the chart

8 anywhere your opinion that he did not have compartment

9 syndrome?

10 A. Again, in my clinical judgment, it wasn't -- it

11 was so low that it was not documentable, if that's a

12 word.

**Defendants' Request for Additional Portions:**

Defendants request the following additional portion be read into evidence: → Granted

```
19      Q.   Did you intend or expect the other physicians to
20   reduce the level of suspicion --
21      A.   No.
22      Q.   -- of compartment syndrome because of your
23   repeated statements that he does not have compartment
24   syndrome?
25      A.   No. Everything in medicine changes, so --
                                                           61
 1   everybody has an eye, and if something changes, it will
 2   trigger a response from them.
```

(61:19-62:2)

**13.) Plaintiff's Requested Portions:**

63:10 Q. So compartment syndrome was on the problem

11 list?

12 A. On Dr. Salman's problem list.

13 Q. Okay. And was it on your problem list?

14 A. My problem list was for orthopedics. It's more

15 of a consideration, but if it's not really suspected, it

16 wouldn't be written down as a problem.

8

**Defendants' Requested Additional Portions:** → Granted

```
20    Q.  (By Mr. Watson) Did Dr. Salman state that he
21 wanted to watch for signs of compartment syndrome?
22    A.  From this note here (indicating), he talked
23 about CKs, but as we talked about before, that's not
24 possible in this situation.
25    Q.  And what are the reasons why the CK elevation is
                                                         63
 1 not possible as an explanation for compartment syndrome?
 2    A.  In this situation?
 3    Q.  Yes.
 4    A.  The overall trauma to the patient with injury to
 5 his musculoskeletal system will cause huge elevations in
 6 the CKs, and it's more of a renal issue.  You can't say
 7 once the CK -- only goes this high for a scapula fracture,
 8 the CK only goes this high for a proximal humerus
 9 fracture, the CK only goes this high for chest injuries,
10 the CK goes only this high for compartment syndromes.
11 Everything is muddled together.  CK -- trying to designate
12 one level in the face of overwhelming skeletal trauma may
13 be frivolous.
```

(63:20-64:13)


**14.)   Plaintiff's Requested Portions:**

68:10 Q. Okay. Did you ever document any findings to

11 rule out compartment syndrome in your notes?

12 A. No. I would not have put any negative

13 findings.

14 Q. Did you ever put anything in the notes as to

15 your medical opinion that he did not have compartment

16 syndrome at any time when you were taking care of him?

17 A. No, due to the fact that he just didn't present

18 that way.


**15.)   Plaintiff's Requested Portions:**

70:21 Q. (By Mr. Watson) Was eliminating the compartment

22 syndrome an important part of your care?

9

23 A. No, because again we did not feel -- I did not

24 feel he had compartment syndrome. To mentally try to

25 eliminate something that he doesn't have, it wouldn't be something that you would do.

**16.)    Plaintiff's Requested Portions:**

22:23 Q. Okay. Do you believe that the material that has

24 been supplied by the American Board of Orthopedic Surgeons

25 to the membership is considered reliable medical authority?

2 MR. ERNST: Object to the form. Not specific.   **Granted**   --No showing of what specific literature is being referenced, the author, the date, etc.

3 MR. VIPOND: Object to form and foundation.   **Granted**

4 A. What material? What material are you saying?

5 The meetings that I went to?

6 Q. (By Mr. Watson) No, the material that is

7 usually provided by the American Board of Orthopedic

8 Surgeons.

9 MR. ERNST: Object on form and foundation.   **Granted**   --No showing of what specific literature is being referenced, the author, the date, etc

10 Vague.   **Granted**

11 A. I would say that what they provide is basic.

**Defendants' Requested Ruling:**

Defendants request the Court to sustain the objections (23:2 & 9) as ==vague and ambiguous== concerning "reliable authority" and "material usually provided" and strike the answers.

**Granted, see above**

**17.)    Plaintiff's Requested Portions:**

38:2 Q. (By Mr. Watson) Were you trained to consider

3 high-velocity trauma as it relates to compartment

4 syndrome?

5 ~~MR. ERNST: Object to form and asked and~~   **Overruled**

6 ~~answered~~.

10

7 A. Again, I can't recall any reason why they would

8 say you have to be extra special vigilant with high

9 velocity versus the average person on the street that fell

10 off their bicycle. You would try to treat both patients

11 the same way with observation.

**Defendants' Requested Ruling:**

Defendants request the Court to rule on the objection (38:5). The question is vague and ambiguous and was asked and previously answered. (11:14-16)


**18.)** **Plaintiff's Requested Portions:**

46:16 Q. When did you make the decision that Wenjia Zhai

17 did not clinically present any suspicion to you of

18 compartment syndrome?

19 A. There is no one day that comes out. It's a

20 process. You do look at the patient, their likelihood

21 depending on where the fractures were or body part, but

22 everything evolves, as you're looking at an orthopedic

23 patient, day-to-day. So no one day. It's a matter of

24 observation.


**19.)** **Plaintiff's Requested Portions:**

47:17 Q. Did you examine both arms?

18 A. Did I examine both arms when?

19 Q. Each day when you were thinking about

20 compartment syndrome.

21 A. Again, I can't say that remembering I'm going in

22 there thinking -- each day, I would look at his splints,

23 his arms, make sure he had good capillary refill, and then

24 make sure that there wasn't anything else that I would

25 think of.

**20.) Plaintiff's Requested Portions:**

50:19 Q. And was your scope of practice the fractures

20 sustained by Wenjia Zhai?

21 A. Correct.

22 Q. And would it be fair to say that your scope of

23 practice also included the risk of compartment syndrome?

24 A. Generalized scope of practice or are you talking

25 about --

51:1 Q. In the care of Wenjia.

2 A. Delegated to me or just everybody? It wasn't

3 delegated. It was I understand the compartment syndrome

4 and its relationship to musculoskeletal injury if that's

5 what you're saying.

**Defendants' Requested Portion:**

```
10      Q.  Were you of the belief that you needed to be
11  ordered to look for compartment syndrome before you would
12  start to look?
13      A.  No.
```

(52:10-13)


**21.) Plaintiff's Requested Portions:**

48:1 Q. Did you look and examine the legs each day?

2 A. Yes, I did.

3 Q. Okay. Did --

4 A. For the first several days.

**Defendants' Requested Portion:**

12

Defendants also request the following brief portions be read into evidence at the beginning of the reading of Dr. Cahoy's deposition testimony at trial in order to provide context concerning Dr. Cahoy's professional background:   **Granted**

```
23      Q.  Doctor, would you state your name, please?
24      A.  Philip M. Cahoy.
25      Q.  And what is your profession?
 1      A.  I'm an orthopedic surgeon.
```
(4:23-5:1)

```
14      Q.  Doctor, where did you go to medical school?
15      A.  University of Nebraska Medical Center.
16      Q.  And when did you graduate?
17      A.  1990.
18      Q.  And you did a residency in orthopedics?
19      A.  Correct.
20      Q.  Where was your residency performed?
21      A.  The University of Wisconsin, hospitals and
22  clinics in Madison, Wisconsin.
23      Q.  How many years was that program, Doctor?
24      A.  From 1990 to 1995.
25      Q.  During that residency program, did you have any
 1  specialized trainings in the subject of orthopedics?
 2      A.  That was -- the residency was orthopedics.
 3      Q.  Okay. And it was a five-year residency?
 4      A.  Correct.
```
(8:14-9:4)

```
12      Q.  (By Mr. Watson) Okay. Are you a board
13  certified orthopedic surgeon?
14      A.  Correct.
```
(15:12-14)

13

DATED this 22nd day of March, 2018.

WENJIA ZHAI, Individually, Plaintiff,

*/s/ Steven M. Watson*
John F. Carroll, #23811
Steven M. Watson, #16075
Watson & Carroll, PC, LLO
160 Centre Place
2809 South 160th Street, Suite 409
Omaha, NE 68130-1755
Phone: (402) 991-2100
John@watsoncarroll.com
steve@watsoncarroll.com
*Attorneys for Plaintiff*

PHILIP CAHOY, M.D., an individual, and CENTRAL NEBRASKA ORTHOPEDICS & SPORTS MEDICINE, P.C., a domestic professional corporation, Defendants,

*/s/ Jeffrey A. Nix*
David D. Ernst, #17292
Jeffrey A. Nix, #23842
PANSING HOGAN ERNST & BACHMAN LLP
10250 Regency Circle, Suite 300
Omaha, Nebraska 68114
Phone: (402) 397-5500
Fax: (402) 397-3834
dernst@pheblaw.com
jnix@pheblaw.com
*Attorneys for Defendants*